MOSES A. BLEDSOE *v.* THE STATE of NORTH CAROLINA.

The provision in the new Constitution (Art. 4, s. 11,) giving to the Supreme Court, original jurisdiction to hear claims against the State, &c., probably intends that such *hearing* shall be chiefly of *the law*, involved in any such claims, including only such general observations upon *the facts* as may be required to render the rules of law laid down, intelligible in their special application. At all events, this must be so in the absence of further legislation, providing the Court with the proper machinery for deciding issues of fact.

CLAIM against the State, *decided* by the Court, at June Term 1869, and ordered to be reported to the General Assembly, for its action: (Constitution of 1868, Art. IV., s. 11.)

The claimant filed his complaint in this Court at January Term 1869, setting forth a claim against the State, for articles delivered to the "Insane Asylum," at the dates, and for the prices specified below, the latter being "in gold coin":

1864.   April 1st to August 2d, 859 1-12 cords pine wood, at $5.00.

1863.   Oct. 1st to 31st, 198⅛ barrels of corn, at $4,65.
        Oct. 14th to 31st, 902⅓ bushels sweet potatoes, at $0.58.

1864.   Oct. 24th, 400 bushels sweet potatoes, at $0.58.

It was also stated that the *wood* was contracted for by Dr. E. C. Fisher, then Superintendent of the Asylum, March 13th 1863, at $20 per cord; that upon the 25th Oct. 1864,

Dr. Fisher gave the claimant an order for $6.000—for the 400 bushels of potatoes, upon which claimant had received at various times, $4000.

That, "in or before April 1865," the claimant sold and delivered to the Asylum, 87 other barrels of corn, worth $6.00 per barrel, and 37 bushels of wheat, worth $3 per bushel; that upon this, he had received in payment, afterwards, in corn, flour, &c., the value of $107.64; that, by act of March 16th 1866, it was decided that all dues to the Asylum should be turned over to the Public Treasury, and that the Asylum, thenceforward, should be supported by direct appropriations from the Public Treasury. The prayer for judgment, was for $6,338.74, in gold, with interest upon different portions thereof, from the various debts above.

A copy of this was served upon the Governor, and the Attorney General.

Upon the 4th of February 1869, an order was made, by consent, that the Clerk should take an account of the matters set forth by the claimant, and empowering him to examine the parties upon oath, and to send for persons and papers.

Afterwards, a report was made by the Clerk, the result of which was, that, including interest to the 10th of February 1869, the claimant was entitled, on account of his claim, to $11,147.90.

Thereupon, the Court, not being satisfied with such report, ordered *eight* issues, covering the whole ground, to be submitted to a jury of Wake county, by the Superior Court, &c.

This was done at Spring Term 1869, before *Watts, J.,* the verdict upon the whole, being that the value of the articles, (after deducting payments) at the time and place of delivery, was $9,408.61.

This finding was thereupon certified to this Court, as required.

*Fowle & Badger and Haywood,* for the claimant.

*Attorney-General, contra.*

READE, J. The Constitution provides, that "The Supreme Court shall have original jurisdiction to hear .claims against the State; but its decision shall be merely recommendatory : no process in the nature of execution shall issue thereon: they shall be reported to the next General Assembly for its action. "Art. 4, s. 11. In the 10th section it is provided that "the Supreme Court shall have jurisdiction to review upon any appeal, any decisions of the Courts below, upon any matter of law or legal inference : but no issue of fact shall be tried before this Court."

Construing the two sections together, we are of the opinion that it was not contemplated, that when a claim is presented against the State, there shall be a "trial" of the facts in detail, but only that we should decide such questions of law as may seem to be involved, together with our own impression of the facts generally, so as to make our decision of the law intelligible. Especially must this be so, unless there shall be some legislation to enable us to find the facts in detail; for we have no jury, and if we had, it would be inconvenient and expensive to bring witnesses from all parts of the State; and depositions are always unsatisfactory. Probably, the provision in the Constitution was induced by the consideration, that many claims would be presented, growing out of the events of the late war, and it was desired that they should have the consideration of the Court, in aid of Legislative action.

We first referred the facts to the Clerk, but his report was unsatisfactory; and we then ordered issues to be tried in a Superior Court by a jury, but we are not satisfied either with the rulings of his Honor, or with the verdict of the jury. And, therefore, we state the facts generally, as they appear to us from the complaint of the plaintiff, and the exhibits filed, and the evidence before the Clerk, and the statements at the Bar.

In March 1863, the plaintiff, who was a director in the Lunatic 'Asylum, entered into a written contract with E. C. Fisher, who was Superintendent of the Asylum, to deliver 3000 cords of pine wood at $20 per cord. The plaintiff now charges $5 per cord, in coin, or its equivalent, with interest from the time of its delivery. And he was allowed by the jury, under instructions from his Honor, $7,50 per cord in the present currency. There are several objections. to allowing this charge. ( 1. ) The plaintiff was a director for the Asylum in 1863-'4, and in that sense was its guardian, and the person with whom he contracted was Superintendent. And it does not appear, nor is there any allegations that the Board of Directors was consulted, which would have been proper in so large a transaction. ( 2. ) It does not appear that there was any necessity for the contract.. Indeed it appears that there was not ; for, none of the wood was delivered until more than a year from the time of the contract, and the greater portion was never delivered at all. ( 3. ) There is no evidence that the wood was worth $20 per cord at the time of the contract ; and when evidence was offered by the State on the trial before the jury, of the price at which wood was selling, the plaintiff objectted to the evidence, and it was ruled out. And it appears from the plaintiff's own statement before the Clerk, that wood was not worth any thing like what he charges ; for, he states that he delivered the wood between April and August, 1864, and that "before some of it was delivered it was selling higher than $20 per cord." Now at that time Confederate money was twenty for one of coin : if therefore he had received Confederate money according to his contract he would have realized but one dollar in coin. Yet he charges five. And, from his statement, we infer, that even in 1864, when he began to deliver the wood, it was not worth $20 per cord; because he says, that " before *some of it* was delivered, it sold for more than $20." Now, if it was only worth $20 in 1864, when Confederate money was twenty

for one, it would only have been worth $5 per cord in 1863, when Confederate money was only five for one. (4.) The wood was to be delivered, not at Raleigh, but in Johnston County. (5.) There was no time stipulated for the delivery. It was stated before us at the Bar by one of the plaintiff's counsel, that he is now receiving in Raleigh from a tract of land adjoining the plaintiff's in Johnston county, pine wood at $2.50 per cord. And we are satisfied from this and other information, that $2.50 per cord in Federal currency, would be a full allowance to the plaintiff, for delivering the wood in Johnston, instead of Raleigh.

Another item is, for 198 barrels of corn, in the Fall of 1863, at $4.65 per barrel, in coin. There was evidence before the clerk, that coin was high at that time, and that individuals gave as much as $1 per bushel in coin, and that the price in Confederate money, was $65 per bushel. We know that during the war *individuals* in some sections, had great difficulty in getting corn at any price. But the State had facilities for getting corn which individuals had not. In the Eastern part of the State corn was abundant and cheap, and the State got large quantities, and furnished the counties, and we do not doubt that the *guardians* of the Asylum might have made an arrangement with the State upon much better terms than the plaintiff's. We are satisfied that $5 per barrel in Federal currency would be a full allowance for the corn furnished in 1863, and $6 per barrel for all the remainder of the corn.

The item of 902 bushels of sweet potatoes, in October 1863, was furnished at the season for gathering them, and we think 75 cents per bushel in Federal currency a full price for them.

The item of 400 bushels about the same time in 1864 was furnished, at $6000, in Confederate money, and $4000 of the amount was paid, which being for two thirds of the 400 bushels, the other one-third (viz) 133 bushels, will be put at 75 cents per bushel.

The "wheat at $3 per bushel in currency" was not sold at all. It was *loaned* in December 1864, to be paid out of the crop of 1865. There was evidence that wheat was worth $3 at the time it was loaned, but there was no evidence that the wheat of the crop of 1865 was worth $3 per bushel. And we think that $2 per bushel in Federal currency is a fair price for that.

The clerk will make out a copy of the plaintiff's complaint, and a copy of this opinion, and an account of the items with the prices we recommend, and sum up the whole, and deduct therefrom the sum of $106,64, which the plaintiff has been paid, and add interest upon the remainder, from May 1865, until 1st January 1869, and transmit the same under the seal of the Court, to the Governor of the State, to be communicated to the General Assembly.

There is nothing in the character of the claim which is illegal. It is for fuel and provisions furnished for the Lunatic Asylum. The fact that they were furnished during the rebellion, is nothing against them. The Asylum is an institution of mercy and charity, in no way connected with the war, and is a sacred duty to maintain it under all circumstances.

It was decided by this Court, in *Att'y. Gen'l.* v. *Cape Fear Navigation Co.,* 2 Ire. Eq. 444, that the State is not bound to pay interest unless there is a special contract to that effect.

The contract, in this case, must be understood to have been made, with reference to the law, as it then stood. But because of the changes in, and the disturbed condition of the government, and because payment has been delayed for a long time, we recommend a departure from the rule so far as to allow interest from the end of the war—say 1st May 1865, until 1st January 1869—when the plaintiff presented his claim to the General Assembly. And we do not recommend interest after that time; because, if the plaintiff had presented a fair and reasonable claim, we are to suppose that

it would have been allowed. The subsequent delay is by his own folly. And, for the same reason, we allow him no costs, but order that he pay the costs of this suit. For stating the account herein directed, the clerk will be allowed $5.

PER CURIAM.                                    *Venire de novo.*